STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-63

CHANDLER GROCERIES, INC.

VERSUS

AYOUB ALI

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 268,231
HONORABLE PATRICIA EVANS KOCH, DISTRICT JUDGE

**********

VAN H. KYZAR
JUDGE

**********

Court composed of Elizabeth A. Pickett, Van H. Kyzar, and Candyce G. Perret, Judges.

AFFIRMED.

**Ramon J. Fonseca, Jr.**
**921 Kaliste Saloom Road**
**Lafayette, LA 70508**
**(337) 456-1163**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Ayoub Ali**

**William M. Ford**
**Susan Ford Fiser**
**Ford Law Office, LLC**
**1630 Metro Drive**
**Alexandria, LA 71301**
**(318) 442-8899**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
**Chandler Groceries, Inc.**

**KYZAR, Judge.**

Defendant, Ayoub Ali, appeals a judgment of the trial court annulling an alleged cash sale from Plaintiff to Defendant of a convenience store/gas station in Rapides Parish. Plaintiff answered the appeal seeking damages and attorney fees in addition to the nullification of the sale. For the reasons set forth below, we affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

At issue herein is a certain Cash Sale deed purporting to transfer property of Chandler Groceries, Inc., consisting of a lot and building housing a convenience store and gas station in Rapides Parish, for $325,000.00.[1] The three-page instrument is dated March 10, 2020, and appears to be in authentic form, having signatures of the seller, through its representative Donald Chandler, the buyer Ayoub Ali, two witnesses, and a Notary Public. It is noted that while the document is three pages in length, the third page consists only of the signature spaces for all signees. The deed, along with a corporate resolution, a description of the property, and a survey plat of the property, was recorded in the conveyance records for Rapides Parish, Louisiana on March 12, 2020.

On June 9, 2020, Plaintiff, Chandler Groceries, Inc., filed suit against Defendant, Ayoub Ali, asserting that it is the owner of immovable property in Rapides Parish, Louisiana described in summary as 1.96 acres, more or less, together with all buildings and improvements located thereon, and all rights, ways, and privileges thereunto appertaining, being, lying, and situated in Section 58, T4N, R2W, Rapides Parish, and being more particularly described on the legal description and shown as the "1.96+/- ACRES" tract on the Certificate of Survey

---

[1] Following the purported sale, the structure on the property was destroyed by fire. At the time of the trial and this appeal, the origin of the fire was undetermined.

2

by W. Aaron Wood, Professional Land Surveyor, dated January 4, 2019. Plaintiff asserts that in early 2020, Mr. Ali inquired about the potential purchase of the property and was told that it could be purchased for the sum of $325,000.00. The petition claims that Plaintiff engaged the services of a local attorney to prepare a credit sale and mortgage and later a Cash Sale deed for this purchase price and that Mr. Ali missed two separate appointments to appear and purchase the property with different excuses each time.

Plaintiff goes on to assert in its suit that, thereafter, Mr. Ali approached Donald Chandler, who is the sole owner and president of the corporation, and requested that he sign a document, which Mr. Ali represented to be a lease that was needed so that he could apply for a liquor license. Plaintiff notes that Mr. Chandler did sign a document, which was represented to him to be a temporary lease agreement, and thereafter, a document purportedly bearing Mr. Chandler's signature was recorded in the conveyance records of Rapides Parish. This recorded document is purported to be a Cash Sale comprising three pages, with a document purporting to be a corporate resolution attached and a copy of a survey.

Plaintiff's petition states that neither the "President of the corporation nor its sole share owner signed any document which was the Cash Sale recorded." It further states that the signature found on the document was not done before a Notary Public and two witnesses and that no corporate resolution or corporate meeting was held. Plaintiff asserts that the document filed in Rapides Parish was fraudulently obtained under false intentions, and prayed for the trial court to "rescind, vacate, set aside, annul, and declare null and void the said purported act of Cash Sale, and further find and hold that it was not and is not translative of title, and further that your petitioner be recognized as the sole owner of the immovable property described above[.]"

3

We note that Mr. Ali initially failed to timely answer the petition, resulting in a default judgment in favor of Plaintiff, after which the trial court granted a new trial on January 25, 2021. Mr. Ali then answered the petition, and this litigation ensued.

A bench trial took place on July 15, 2021. Donald Chandler, 77 years old at the time of trial, testified that he was a farmer, a pilot who also owned a crop-dusting business, and a commercial fish farmer. He has lived in Rapides Parish all his life. He stated that the gas station/convenience store business known as Chandler Groceries sat along La. Hwy 28 and was part of his larger tract of land containing around 324 acres. He operated that store for approximately 10 years after building it, following the transfer from him personally to the corporation, Chandler Groceries, Inc., Plaintiff herein. He then began to lease the operation of the store out for others to run. He had previously leased the store for 10 years to Jason Heath Parker, prior to becoming involved with and renting it to Mr. Ali.

Mr. Chandler testified that Mr. Ali first approached him along with his father at Chandler Aviation Services, his crop-dusting business, to inquire about buying the grocery store. About three weeks later they came back to the aviation business to again discuss buying the store. An offer of $325,000.00 was discussed, with $200,000.00 to be paid in cash, and $125,000.00 in a personal check. Mr. Chandler advised that a check as partial payment was not acceptable.

As Mr. Ali persisted in his effort to buy the property, Mr. Chandler contacted his lawyer, Michael Walters, to prepare a credit sale, with $200,000.00 payable in cash and a promissory note and mortgage for $125,000.00. When this fell through, Mr. Chandler had Mr. Walters prepare a Cash Sale deed for the full $325,000.00 purchase price. Neither transaction was accomplished.

4

Mr. Chandler testified as to the events leading to the Cash Sale document in question dated March 10, 2020.

> A. We, we talked, uh, several times in, in a month about the sale. And, and when they -- we were going, when they were going to pay me, and they kept putting me off and putting me off and, and finally we was in the office and he, he had a, uh, document, and he asked me to sign it and (interrupted)
>
> Q. Okay. Now, was that the same day that you went down to, uh, Ms. Diane DeVille's notary (interrupted)
>
> A. That is the same day. Yes.

Mr. Chandler testified that he met with Mr. Ali at the office in the store, where Mr. Ali told him he needed him to sign a document for him, Mr. Ali, to get his liquor license. No money was exchanged. After that they went to a notary's office, though neither he nor Mr. Ali signed anything in front of the notary and no witnesses went with them to the notary's office. Mr. Chandler acknowledged that the signature on the deed in question appears to be his but maintained that he did not sign any document resembling the deed. He stated that after the March 10 date, Mr. Ali paid him two checks, for $1,500.00 each, representing rent that Mr. Ali was paying for the store, and, after that, Mr. Ali paid rent in cash. During this time, Mr. Chandler continued paying for maintenance for the building, represented by checks he identified and introduced as evidence.

Audrey McQueen, whose name appears as a witness on the March 10, 2020 Cash Sale deed in question, also testified. She stated that she worked at the subject grocery store for the previous renter, Heath Parker, and then worked for Mr. Ali for three weeks. It was during this time Mr. Ali asked her to sign a document to assist him in getting a liquor license from Alcohol and Tobacco Commission (ATC). When asked to examine the March 10 deed, the following colloquy took place:

> Q. Did, did you sign and witness a sale document between Mr. Chandler and Mr. Ali?

5

A. We signed a paper, but we were told it was for the ATC. I don't remember signing this exact paper.

Q. Does it look like the paper you signed?

A. No.

Q. What, what, what were you asked to sign?

A. A paper stating that we were under him, under the ATC for him to get his liquor license.

Q. And who is, who asked you to sign that?

A. Ali.

Ms. McQueen testified that she never heard any discussions between Mr. Chandler and Mr. Ali concerning the sale of the business or property, nor did she ever see any money exchanged between them.

Christie Delaney, whose name also appears as a witness on the March 10, 2020 Cash Sale document, then testified. When asked about the events that day, she stated that she signed a document but did not read it. She was asked to examine the March 10, 2020 Cash Sale and stated that she did not recognize it. She testified that she had been asked to sign a document by Mr. Ali who told her it was to get a liquor and tobacco license. No one else signed the document in her presence and she does not know the notary, Dianne Deville, nor has she ever been to her office. She at no point witnessed any money pass between Mr. Ali and Mr. Chandler.

The notary Dianne DeVille testified. She stated that she is a Notary Public in Rapides Parish and vaguely knew Mr. Chandler from previous business but did not know Mr. Ali. On March 10, 2020, the two men came into her business office, and she was asked to notarize signatures. As to the March 10, 2020 Cash Sale deed in question, the following colloquy occurred:

6

Q. Okay. And, uh, do you recall them presenting you with a three page Cash Sale document at that time?

A. No, sir.

Q. What did, what did you recall having?

A. Two page document.

Neither Mr. Ali nor Mr. Chandler signed the document she was given in her presence. She merely asked them if they signed and was told yes. No witnesses were present for any signatures and no money changed hands between Mr. Ali and Mr. Chandler in her office. On a later date, Mr. Ali came back to the store demanding that Ms. DeVille sign another document for him concerning the transaction, but she refused. Her husband was present and made Mr. Ali leave the premises.

Michael Walters testified next, stating that he had been legal counsel for Mr. Chandler for a number of years, particularly for real estate matters. Mr. Chandler contacted him to advise him that he had a potential buyer for the grocery store property, and Mr. Walters agreed to prepare the deed necessary to accomplish the sale. He testified that he initially prepared a credit sale deed at Mr. Chandler's request, with a sale price of $200,000.00 in cash and a promissory note for $125,000.00. However, that document was never executed. He proceeded to prepare a cash sale document for the transaction for $325,000.00, but it too was never perfected.

Q. Did, did anybody ever come in your office to pass this sale?

A. Donald Chandler came in that day and said that, uh, they had been sitting -- uh, they rode together. They had been sitting in my parking lot waiting on Mr. [Ali]'s dad to come in from Lafayette with the Two Hundred Thousand Dollar cashier's check for the closing, and Mr. Chandler came in and said, uh, Mr. [Ali]'s dad had been in a car accident on the way and that it wasn't gonna happen today so they left.

Q. You didn't see Mr. Ali that day.

7

A. I did not.

Q. What was the next, uh, thing that happened with regard to this matter?

A. A couple of weeks later Mr. Chandler called me and said that they have the entire Three Hundred Twenty - Five Thousand now. I said okay I'm gonna – we'll just tear the old documents up, and I will prepare a cash sale for Three Hundred Twenty - Five Thousand which I did. That document was completed on the, uh, 25th, and they were scheduled to come in on the 26th.

Q. Come in to your office (interrupted)

A. March, I'm sorry, March 26th 2020, come to my office and sign.

Q. And, and, uh, did that -- did they show up?

A. Mr. Chandler showed up. Mr. [Ali] did not.

Q. So, so, uh, that sale wasn't passed either.

A. No, sir.

Q. And so, uh, then -- so you had prepared two documents. Sale and mortgage first earlier in the month, and then this document, and, and, uh, what day was, what day was Mr. Ali scheduled to come in?

A. For the cash sale or the (interrupted)

Q. Yes.

A. Uh, March 26th, 2020.

Q. What, were you aware at that time that, that he had recorded a, a sale of Mr. Chandler's store, uh, two weeks before that on March the 12th[?]

A. No. I became aware of that probably in May. Mr. Chandler had called me and said I think there's been a deed filed, and I got on the courthouse computer and found that, and, at that point, I referred him to you immediately.

Q. Did, did -- so no sale was ever passed in front of you?

A. No, sir.

Q. You sent Mr. Chandler a bill on March the 26th, did you not, for Nine Hundred Dollars?

8

A. Yes, for preparation of documents.

Q. Did, did he pay it?

A. Yes.

Q. Did, did you know why -- any explanation given to you as to why, uh, the, uh, Mr. Ali and his father or Mr. Ali and/or his father didn't show up to buy the property?

A. No, sir. Mr. Chandler, just called and said the deal was off apparently, send him a bill, so we did.

After Plaintiff rested its case, Mr. Ali testified, personally and through the use of an interpreter. He stated that in early 2020, he learned that Mr. Chandler wished to sell the store building through his father and brother. He went to look at the property, and the initial asking price was $350,000.00. After some talk, a price was agreed upon at $325,000.00. On Feb. 27 or 28, 2020, Mr. Ali separately bought the store inventory from the then lessee/operator, Heath Parker, for $25,000.00.

As to the actual Cash Sale deed dated March 10, 2020, by which Mr. Ali claims to have purchased the property, he testified that it was provided by Mr. Chandler himself and that he, Mr. Ali, took it to an attorney in Carencro, LA to make sure it was good.

Q. Who, who prepared the Cash Sale?

A. by Ali: Donald Chablis -- oh, Christopher -- the lawyer in, um, Carencro.

Q. Right.

A. [] Yeah.

A. Donald gave me the Cash Sale and then I took it to the attorney in Carencro to make sure that everything is okay in it.

Q. Okay. And what did he say?

A. Um, he said it's okay. Sign it and have it notarized and bring it to my office, and I will, um -- yeah, and I will, uh, record it.

9

Q. So, so he instructed you on how to execute the document?

A. Yes.

Q. Okay. Um, and tell me about when, tell me about the process in getting the document executed.

A. I, I brought the papers with me. I went to the store in the morning and Donald was waiting for me at the store. And after that we went inside the office because, uh, he was concerned that he did not want anyone to see that I was giving him money that he wanted to do it inside. He was concerned that someone might rob him.

Q. And how, how much money did you deliver to Mr. Chandler?

A. Uh, Three Hundred and Twenty-Five Thousand Dol, uh, Three Hundred and Twenty-Five Thousand.

Later, he stated that Mr. Chandler did not count the money, he just looked at it. The money was contained in two grocery bags similar to the cloth totes obtained from the checkout at Walmart.

Q. So, so after you signed the -- or after you delivered the cash, was that the time that y'all that you and Mr. Chandler signed the Cash Sale?

A. Yes.

Q. And what, and what happened next?

A. The two employees I had at the store, they signed the papers, and then me and him we went, we went to the notary public after that.

Q. Okay. The, uh -- was there anybody else in the store besides the two employees that could have witnessed?

A. My brother was there but he had just arrived. And, and he saw Donald when he put the bag, uh, in his, in his truck, in his old truck.

Q. After, after you signed?

A. Yes.

Q. Um, what, what did you tell the, the witnesses to that document they were signing?

A. I bought the building.

Q. So they understood that you were buying the building?

10

A. Yes. And, and I took a picture of their, um, driver's licenses, but I lost my, uh, my phone where I had stored that in.

Q. Okay. I see. But so you took pictures of their driver's licenses. Did you provide those to the notary?

A. The notary did not ask me about the witnesses. She just asked about mine and Donald's.

Later in his testimony, Mr. Ali attempted to explain why he gave Mr. Chandler two checks later in March of 2020 for $1500.00 each, stating that it had something to do with the air conditioning.

Q. Could you explain what those checks were for?

A. When I went to buy the building, there was something that he was supposed to do with the AC. I wasn't sure what it was. Something that he was supposed to do with the kitchen. I did not know what it was, and something that he was supposed to do with the sewer system, and I didn't know what that was.

Mr. Ali denied having anything to do with the fire that destroyed the building, stating that he was out of town when it occurred. When asked why the building was insured for $2,000,000.00 when he only paid $325,000.00 for it, Mr. Ali testified this is the amount that the insurance representative recommended.

Mr. Ali's father, Wahid Yousef, testified that he initially met with Mr. Chandler and offered him $200,000.00 cash and a personal check for $125,000.00 for the grocery store property, on behalf of his son Mr. Ali. He stated that Mr. Chandler would not accept a personal check. Mr. Yousef testified that he had authorized Mr. Ali to have $200,000.00 cash to purchase the property, although Mr. Ali had initially taken the money without his authorization. He does not know where his son got the remainder of the money for the purchase.

Nidal Ali, Mr. Ali's brother, testified and stated that he was with Mr. Ali when he went to the store to meet with Mr. Chandler. He stated he saw a bag that he thought had money in it, although he did not personally see the money. He

11

stated that the bag was given to Mr. Chandler. He notes that he remained in the car while Mr. Ali and Mr. Chandler met and did not go into the building nor witness any documents being signed.

Robert Soileau, who is employed in insurance sales with Haik Insurance Holdings, also testified at trial. He stated that he was contacted by Mr. Ali in 2020 and that Mr. Ali was interested in purchasing insurance for the store, Chandlers Groceries, in Rapides. Coverage was bound in April of that year. Mr. Soileau testified that Mr. Ali specifically asked for the building to be insured for loss by fire for $2,000,000.00, rather than that being an amount recommended by him. Mr. Ali did not tell him that he purchased the property for only $325,000.00. Mr. Ali gave Mr. Soileau the name of North West Enterprises as the insured. At the time of the insurance transaction, Mr. Soileau states that he did not feel that there was a language barrier between him and Mr. Ali.

On August 30, 2021, the trial court issued written reasons for judgment, finding in favor of Plaintiff, nullifying the Cash Sale. Therein, the trial court recited its factual findings pertaining to each of the witnesses that testified at trial, including the Notary Public and witnesses whose names appear on the instrument, making numerous credibility determinations thereon, and concluded "[f]or written reasons given this date, this Court has been presented evidence that make it clearly convincing that the Cash Sale filed on March 12, 2020 . . . was fraudulently secured under false pretenses and is therefore rescinded, vacated, set aside and declared null and void." Formal judgment was rendered the same day, declaring the deed to be null and void, and ordering the Rapides Clerk of Court to so note on the instrument where it is recorded in the conveyance records for the parish. Mr. Ali was cast with all costs of the proceedings.

12

On October 15, 2021, Mr. Ali moved for a devolutive appeal of the judgment, which was granted on October 30, 2021. Therein, he asserts two assignments of error, as follows:

> 1. The Trial Court committed legal and factual error in determining that consent was vitiated by fraud.
>
> 2. The Trial Court committed legal and factual error in ruling that Donald Chandler's execution of the Cash Sale did not satisfy an act by private signature.

Plaintiff thereafter answered the appeal, seeking to be awarded damages for the loss of use of the property, damage to the property, lost rental income, and attorney fees.

## DISCUSSION

Mr. Ali first asserts that the trial court committed legal and factual error in declaring the Cash Sale null and void as being the product of fraud perpetrated by him. Appellate review of factual determinations of the trial court is conducted pursuant to the manifest error-clearly wrong standard, which precludes setting aside the trial court's findings of fact unless they are clearly wrong in light of the record viewed in its entirety. *Rando v. Anco Insulations Inc.*, 08-1163, 08-1169 (La. 5/22/09), 16 So.3d 1065. Great deference is given to the trial court's determination of the credibility of witnesses, except where "documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable finder of fact would not credit the witness's story." *Rosell v. ESCO*, 549 So.2d 840, 844-45 (La.1989).

"Appellate review of a question of law is simply a decision as to whether the trial court's decision is legally correct or incorrect." *Dugan v. Gen. Servs. Co.*, 01-511, p. 3 (La.App. 3 Cir. 10/31/01), 799 So.2d 760, 763, *writ denied*, 01-3327 (La.

13

3/15/02), 811 So.2d 942. When a "trial court's decision was based on its erroneous application of law . . . its decision is not entitled to deference by the reviewing court." *Id.* When an appellate court finds a reversible error of law, the appellate court "must redetermine the facts de novo from the entire record and render a judgment on the merits." *Id.*

"Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other[,]" and it "may also result from silence or inaction." La.Civ.Code art. 1953. "Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence." La.Civ.Code art. 1957.

While Mr. Ali argues that the trial court committed legal error in its finding of fraud on his behalf, a trial court's finding of fraud necessary to vitiate consent is reviewed under the manifest error standard of review. *Succession of Davisson*, 50,830 (La.App. 2 Cir. 12/22/16) 211 So.3d 597, *writ denied*, 17-307 (La. 4/7/17), 218 So.3d 111.

> The Louisiana Civil Code's writing requirement for the sale or transfer of immovable property states that the parties must execute "an authentic act" or "act under private signature." La.C.C. arts. 1839 and 2440. An authentic act is a "writing executed before a notary public or other officer authorized to perform that function, in the presence of two witnesses, and signed by each party who executed it, by each witness, and by each notary public before whom it was executed." La.C.C. art. 1833. In contrast, an act under private signature only requires the signatures of the parties and does not require the act be signed by the party in whose favor it is made. Acceptance may be established by acts clearly indicating it. La.C.C. art. 1837; *See Mitchell v. Clark*, 448 So.2d 681, 686 (La. 1984) and *Cecil Blount Farms, L.L.C. v. MAP00-NET*, 47,246 (La.App. 2 Cir. 7/25/12), 104 So.3d 1, 5, *writ denied*, 2012-2263 (La. 1/11/13), 107 So.3d 614.

> . . . .

> A sale is a contract whereby a person transfers ownership of a thing to another for a price in money. The thing, the price, and the

14

consent of the parties are requirements for the perfection of a sale. La.C.C. art. 2349. Because a sale is a conventional obligation, a valid contract must exist. A contract is an agreement between two or more parties whereby obligations are created, modified, or extinguished. La.C.C. art. 1906. A contract is formed by the consent of the parties established through offer and acceptance. La.C.C. art 1927.

The court must find there was a meeting of the minds of the parties to constitute the requirement of consent. *Worley v. Chandler*, 44,047 (La.App. 2 Cir. 3/4/09), 7 So.3d 38, 41-42. Consent may be vitiated by error, fraud, or duress. La.C.C. art. 1948. Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. La.C.C. art. 1953. Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill. However, this exception does not apply when a relation of confidence has reasonably induced a party to rely on the other's assertions or representations. La.C.C. art. 1954.

Fraud need only be proven by a preponderance of the evidence and may be established by circumstantial evidence. La.C.C. art. 1957. Parol evidence is permissible when error, fraud, or duress is alleged. Revision Comment (b) of La.C.C. art 1848. Even without evidence of specific statements, fraud may be proved by "highly suspicious facts and circumstances surrounding a transaction." *Skannal v. Bamburg*, 44,820 (La.App. 2 Cir. 1/27/10), 33 So.3d 227, 237, *writ denied*, 2010–0707 (La. 5/28/10), 36 So.3d 254.

*Id. at* 609-10.

Here, the trial court determined that the Cash Sale deed was not an authentic act. That finding is not clearly wrong or manifestly erroneous. In so concluding, the trial court considered the testimony of Diane Deville, the Notary Public whose name appears on the deed. The trial court found as matters of fact that she "was a reluctant witness" who "readily admitted the limitations of her notarial transactional business with Ali and Chandler" who testified that she "has little memory of the events of that day"; "[s]he does not remember if Ali or Chandler had witnesses that day"; "[s]he did remember that the[sic] Chandler and Ali had already signed the document"; "[s]he did not read the document or discuss the

15

contents of the documents with Ali or Chandler"; and that "the two individuals did not sign in her presence."

The trial court further considered the testimony of one of the witnesses to the alleged deed, Audrey McQueen, finding as fact that she did not recall the deed but was asked to witness the signing of "something for the ATC, Alcohol Tobacco Commission" and that while she signed a document, "[s]he did not see Chandler or Ali sign any documents." The trial court also considered the testimony of the other alleged witness to the deed, Christy Delaney. In its reasons for judgment, the trial court found as a matter of fact that Delaney signed her signature to a document "while she was at work" and "vividly remembers being told that the document was for a liquor license." She "doesn't remember if anyone else's signature was on the paperwork before hers or not[;]" she "did not go to the notary's office" and "did not see Chandler or Ali sign."

Based on these findings alone, the trial court was not clearly wrong in determining that the purported Cash Sale deed did not meet the requirements for an authentic act, nor did it meet the requirements of an authenticated act. *See* La.Civ.Code art. 1833. Thus, the question becomes whether the transaction was a valid sale under private signature.

Louisiana Civil Code Article 2439 provides that a "[s]ale is a contract whereby a person transfers ownership of a thing to another for a price in money[]" and "[t]he thing, the price, and the consent of the parties are requirements for perfection of a sale." However, "[c]onsent may be vitiated by error, fraud, or duress." La.Civ.Code art. 1948. Here, the trial court found as a matter of fact that there was no agreement to sell the property as the document that ultimately appeared to do so was produced and executed fraudulently by Mr. Ali, as stated in its written reasons.

16

The cash sale itself was greatly disputed and suspicious as previously described. Chandler along with the two witnesses stated that the document they believed they were signing concerned a request for a liquor license. In addition, once the document was signed, Ali did not provide a copy of the instrument to Chandler.

Chandler stated that it appeared to be his signature but was unyielding that he did not sign a cash sale deed. Chandler is familiar with documentation required for real estate transactions with evidence of real estate transactions being introduced at trial[.] Chandler used the services of an attorney and was ready to do so in this sale as well. This Court is satisfied that the document presented as a cash sale was not what was presented to Chandler to sign.

Recognizing your signature is not the same as acknowledging your signature for the purposes of La. C.C. Art. 1836 and 1839 to transfer immovable property. Like the *Skannal* court,[2] this Court finds the circumstances surrounding the execution of the cash sale deeds highly suspicious and further finds that it does not satisfy an act by private signature. The proof has been strong and convincing that this transaction is plagued with inconsistencies and misguidance.

We find no manifest error in the conclusion of the trial court. Neither of the purported witnesses to the sale recognized the document introduced as evidence and did not in fact witness any signatures thereon. Each of them thought they were being asked to witness a document for a liquor license application. There was no notary present when they signed the document, in whatever form it was in at the time. The notary public did not recognize the full document, nor did she witness the signatures of either Mr. Chandler or Mr. Ali. She stated the document she examined on March 10, 2020 was a two page document, not three pages, as the recorded deed is.

A review of the Cash Sale document is also supportive of the factual findings of fraud by the trial court. It appears to have been prepared so as to place the signature page by itself as page three of three, with the entirety of the dispositive sale language on pages one and two, despite there being large space

---

[2] *Skannal v. Bamburg*, 44,820 (La.App. 2 Cir. 1/27/10), 33 So.3d 227, *writ denied*, 10-707 (La. 5/28/10), 36 So.3d 254.

gaps on the first two pages. The signature page could easily have fit into a two-page document, but that is not what is presented. Indeed, a review of the unexecuted cash sale deed prepared by Mr. Chandler's attorney, Mr. Walters, included the same language and signature arrangement, but was fully accomplished as a two-page document with the signature spaces included within the dispositive sale language on page two. While Mr. Ali adamantly argues that he presented the Cash Sale deed for signing as was recorded with the clerk of court, that testimony was contradicted, and the trial court rejected his account of the events. As stated by the trial court in its written reasons:

> The testimony was very revealing in how the pieces to deceive were put into place. That deception involved multiple parties and multiple events. The version given by Ali was self-serving while the testimony of the others — Mr. and Mrs. Deville, McQueen and Delaney - were more accurate reflections of the events of that day in which the cash sale was developed.

As reflected from the above, the trial court made significant credibility determinations in deciding this case.

> It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.

*Rosell*, 549 So.2d at 844 (quoting *Arceneaux v. Domingue*, 365 So.2d 1330, 1333 (La.1978)). It is not our role to second guess these determinations. Thus, we find no error in the trial court's decision finding that Defendant, Mr. Ali, fraudulently created and executed the Cash Sale deed, and determining the same to be null, void, and set aside. Mr. Ali argued in the trial court, and does so here, that any fraud he committed did not vitiate consent because Mr. Chandler could have "ascertained the truth without difficulty, inconvenience, or special skill." La.Civ.Code art. 1954.

18

The trial court rejected this argument at least implicitly in its finding of fact as recited above, concerning the multi-layered fraudulent scheme perpetrated by Mr. Ali, and we find no manifest error in this decision.

Having affirmed the trial court's decision annulling the Cash Sale deed for fraud, Mr. Ali's second assignment of error that the trial court committed legal and factual error in ruling that Mr. Chandler's execution of the Cash Sale did not satisfy the requirements of an act under private signature is rendered moot. An authentic act is full proof of the agreement contained in it, against the contracting parties, their heirs or assigns, unless forgery is alleged and proved. La.Civ.Code art. 2236. Further, recorded deeds of conveyance speak for themselves, and subsequent parol evidence cannot be admitted to modify their terms unless fraud or error is alleged. *Mathieu v. Nettles*, 383 So.2d 1337 (La.App. 3 Cir.), *writ denied*, 390 So.2d 202 (La.1980). The same is true for acts under private signature, where fraud is alleged and proven, as was the case here. *Smith v. Remodeling Serv., Inc.*, 94-589 (La.App. 5 Cir. 12/14/94); 648 So.2d 995. Considering the foregoing, we find no manifest error in the trial court's judgment.

Plaintiff has answered the appeal, seeking damages for its loss of use of the property and for attorney fees. In its original petition, Plaintiff indeed sought such. Following trial on the merits, however, the judgment of the trial court was silent as to any award as prayed for. "Where a trial court's ruling is silent with respect to any demand which was at issue under the pleadings, such silence constitutes an absolute rejection of such demand." *VaSalle v. Wal-Mart Stores, Inc.*, 01-462, p. 8 (La. 11/28/01), 801 So.2d 331, 337.

Louisiana Civil Code Article 2324.1 provides that "[i]n the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion

19

must be left to the judge or jury." The burden of proving damages is on the party seeking such.

> A court is not justified in fixing damages in the absence of definite proof. The plaintiff has the burden of proving the damage suffered by him as a result of the breach of contract. In a breach of contract action, the plaintiff is entitled to recover the amount of loss he has sustained and the profit of which he has been deprived. LSA-C.C. art. 1934. While the absence of independent, corroborating evidence may not be fatal to the plaintiff's burden of proof, the lack of even a minimal degree of detail or specificity as to the extent of loss precludes an award. *Casadaban v. Bel Chemical & Supply Company, Inc.*, 322 So.2d 854 (La.App., 1st Cir. 1975). Speculation and conjecture cannot be accepted as a basis for fixing loss of earnings or profits. *Jones v. Rodgers*, 179 So.2d 674 (La.App., 2d Cir. 1965).

*Campbell v. Lelong Trust*, 327 So.2d 533, 536 (La.App. 2 Cir.), *writ denied*, 331 So.2d 494 (La.1976), *and writ denied*, 331 So.2d 496 (La.1976).

In the instant case, there was little to no evidence of damages for the trial court to reasonably make an award, other than speculation. The only testimony remotely related to damages sought came during the testimony of Mr. Chandler, during the following exchange:

Q. Has he ever paid Three Hundred Twenty-Five Thousand Dollars to you for that property?

A. No.

. . . .

Q. Have you lost all of the monthly rental of Three Thousand Dollars per month on that store since it burned? Since it burned on June 7, 2020?

A. Have I received anything after it burnt?

Q. No, have you lost, have you lost it. Right. Have you been unable to rent it?

A. Right. Yes.

Q. And are you currently in possession of the store property that's just sitting out there in destroyed condition?

A. Yes.

20

Q. Yes what?

A. It's just sitting there burnt up just idle land.

Q. And have, have you been able to clean up the premises or replace the store?

A. No, sir, I haven't done nothing.

Q. And has the value of that store property been diminished with it having been destroyed and then, uh, lying there, uh, out of use and out of order and unable to use it for so many, uh, for so long?

A. Yes.

Obviously, the entire premise of the lawsuit here is that Mr. Chandler did not sell the business to Mr. Ali, thus, there is no expectation of receiving the $325,000.00 purchase price. Further, there is no proof in this record pertaining to the cause of the fire that destroyed the use of the building or whether Mr. Ali had any fault therefore. Accordingly, we find no error in the trial court's failing to award damages.

Plaintiff further argues that the trial court erred in failing to award attorney fees. We also find no error in failing to do so. "Louisiana courts have long held that attorney fees are not allowed except where authorized by statute or contract." *Stutts v. Melton*, 13-557, p. 8 (La. 10/15/13), 130 So.3d 808, 814. No such statute or contract exists here so as to give the trial court any authority to award attorney fees.

## DECREE

For the reasons above, the judgment of the trial court is affirmed in its entirety, declaring the Cash Sale filed on March 12, 2020 to be declared null, void, and set aside, and directing the Ninth Judicial District Clerk of Court to note on the Cash Sale recorded in Conveyance Book 2137 at Page 597 bearing instrument number 1663692 the judgment annulling and setting aside any purported sale and

21

transfer of immovable property. The trial court's decision not to award damages and attorney fees to Plaintiff is also affirmed. All costs of these proceedings are assessed to Defendant, Ayoub Ali.

**AFFIRMED.**